**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MALCOLM GITTINS,** | : | |
| **Administrator of the Estate of Sean Gittins,** | : | |
| **deceased, and as personal representative of** | : | |
| **Sean Gittins,** | : | |
| **Plaintiff** | : | |
| | : | **No. 2:16-cv-00757** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **GATEWAY CLIPPER INC.,** | : | |
| **trading and doing business as** | : | |
| **GATEWAY CLIPPER FLEET,** | : | |
| **Defendant** | : | |

<u>**MEMORANDUM**</u>

Before the Court is a Motion for Costs filed by Plaintiff Malcolm Gittins.   (Doc. Nos. 115, 116.)   For the reasons discussed below, the Court will grant the motion.

**I.      BACKGROUND**

On June 8, 2016, Malcolm Gittins, Administrator of the Estate of Sean Gittins, deceased, and as personal representative of Sean Gittins ("Plaintiff"), filed a complaint against Gateway Clipper Inc. ("Gateway Clipper" or "Defendant"), alleging three counts: (1) a claim under the Merchant Marine (Jones) Act, 46 U.S.C. § 30104 <u>et seq.</u>; (2) a claim of Unseaworthiness; and (3) a claim of negligence, arising out of the death of Sean Gittins (the "Decedent"), from drowning after falling or jumping overboard from the Gateway Clipper vessel, the Duchess, into the Monongahela River, on July 20, 2014.   (Doc. No. 1.)   At the time of his death, the Decedent was an employee of Gateway Clipper.   (<u>Id.</u> ¶ 12.)   Plaintiff asserted jurisdiction based on the Jones Act and 28 U.S.C. § 1333, which provides federal courts with original jurisdiction over admiralty and maritime claims.   (<u>Id.</u> ¶ 41.)

After the entry of a case management order (Doc. No. 18), the parties engaged in a period

of discovery until June 2017.   A post-discovery settlement conference was scheduled for July 28, 2017 before United States District Judge Cathy Bisson.   (Doc. No. 33.)   On July 26, 2017, prior to the status/settlement conference, Plaintiff filed a motion for leave to file an amended complaint to conform with the evidence.   (Doc. No. 34.)   Plaintiff's motion sought to amend his complaint to remove counts one and two, and proceed solely on a claim of negligence, based on information obtained in discovery indicating that Decedent was not acting as a member of the crew of the Duchess and was not acting in the service of the vessel at the time of his death.   (Id. ¶ 29.)   Defendant did not oppose the motion.   After the status/settlement conference, Judge Bisson directed the parties to cross-file briefs regarding whether the Court retained admiralty jurisdiction over this matter assuming that negligence was the only remaining cause of action. (Doc. No. 37.)   Defendant filed a brief regarding admiralty jurisdiction on August 7, 2017. (Doc. No. 38.)

On September 27, 2017, this matter was reassigned to the undersigned.   (Doc. No. 39.) On October 3, 2017, Defendant filed a motion for leave to file a supplemental brief addressing admiralty jurisdiction (Doc. No. 40), which this Court granted (Doc. No. 41).   The Court thereafter granted Plaintiff's motion for leave to file an amended complaint and determined that this Court could properly retain admiralty jurisdiction over Plaintiff's amended complaint despite the dismissal of Plaintiff's Jones Act and Unseaworthiness claims.   (Doc. No. 43.) Subsequently, on April 3, 2018, the Court held a status conference with the parties, after which the parties participated in an unsuccessful mediation.   (Doc. No. 48.)   The parties continued to engage in discovery, and after two consent motions for an extension of time to file expert reports (Doc. Nos. 50, 52), which were granted by the Court (Doc. Nos. 51, 53), Plaintiff's expert reports were filed on September 7, 2018 (Doc. No. 56), with Defendant's following on October

9, 2018 (Doc. No. 57).

At the same time that it filed its expert reports, Defendant filed a Motion for Protective Order with Respect to Sensitive Security Information.   (Doc. No. 58.)   The basis for the Motion for Protective Order was the stated need to protect information constituting "Sensitive Security Information" under federal law from disclosure in connection with Defendant's Facility Security Plan, maintained pursuant to the Maritime Security Act of 2002 ("MTSA").   (Id.)   The issue arose after Plaintiff's expert Captain Richard DiNapoli ("Captain DiNapoli") filed a report in which he opined that Defendant had failed to comply with various provisions of MTSA, and Defendant sought to disclose its Facility Security Plan to its experts so that they could rebut Captain DiNapoli's conclusions about Defendant's failure to comply with MTSA.   (Id. at 1-4.) Plaintiff filed a response to the Motion for Protective Order on October 23, 2018 (Doc. No. 61), after which the Court held a status conference with the parties on October 30, 2018 (Doc. No. 65).   After that conference the Court issued an Order granting Defendant's Motion for Protective Order (Doc. No. 66), and the Protective Order was entered on the docket of this matter on October 31, 2018 (Doc. No. 67).

The Court held another status conference with the parties on November 30, 2018, at which conference the parties discussed the potential need for supplementation of expert reports and the possibility of reopening fact discovery in light of Defendant's recent disclosure of its Facility Security Plan.   (Doc. No. 75.)   At that time, the Court determined that it would need to examine the Facility Security Plan and Defendant's expert reports prior to determining if fact discovery should be reopened.   (Id.)   Accordingly, the Court issued an Order requiring Defendant to produce under seal to the Court two digital copies of the Facility Security Plan maintained by Defendant in accordance with MTSA, as well as Defendant's expert reports

3

relating to the Facility Security Plan, on or before January 14, 2019.   (Doc. No. 74.)   The Court scheduled a follow-up status conference for January 25, 2019.   (Id.)

On January 25, 2019, the Court conducted an extensive conference with counsel for both parties and determined that Plaintiff was entitled to additional discovery in this matter relevant to the Facility Security Plan maintained by Defendant in accordance with MTSA, disclosed by Defendant to Plaintiff on or about November 8, 2018.   (Doc. No. 79.) The Court directed counsel to confer and submit a proposed Order to reopen discovery limited to the issue of Defendant's Facility Security Plan.   (Id.)   Due to a dispute between Plaintiff and Defendant regarding the length of time and scope of any reopened discovery period, the parties failed to comply with the Court's directive to submit a joint proposed Order, instead submitting alternative proposed Orders.   (Doc. Nos. 80, 81.)

Subsequently, on April 17, 2019, the Court issued an Order reopening discovery in this case as to "matters relating to the Facility Security Plan for a period of 100 days from the date of this Order."   (Doc. No. 83.)   In its Order, the Court stated that "during [this] time the parties may obtain discovery from any witness, whether or not previously deposed, who may be in possession of information related to the Facility Security Plan."   (Id. at 2.)   The Court also stated that "[a]ll fees, expenses, and/or costs of such discovery shall remain the burden of the party who would typically bear the same under the Federal Rules of Civil Procedure and/or applicable precedent until further Order of Court."   (Id.)   The Court scheduled a post-discovery status conference for August 2, 2019.   (Id.)

On June 27, 2019, more than two months after the issuance of the Court's April 17, 2019 Order, and just over a month before the reopened period of fact discovery was scheduled to close, Defendant filed a Motion for Protective Order (Doc. No. 87), seeking to avoid or limit

4

disclosure to Plaintiff of relevant information pertaining to the Facility Security Plan. Specifically, Defendant sought to prohibit Plaintiff from taking the deposition of Defendant's Rule 30(b)(6) Designee and seven other current or former employees of Defendant.   (Id.) Plaintiff filed a response several days later (Doc. No. 88), and ultimately, on July 17, 2019, the Court issued an Order denying Defendant's Motion for Protective Order (Doc. No. 89).

In its July 17, 2019 Order, the Court reviewed the history of this discovery dispute pertaining to the Facility Security Plan, noting that "Defendant's disclosure of the existence of the Facility Security Plan came after the conclusion of fact discovery in this matter by way of Defendant's expert reports (Doc. No. 57), which included references to the Facility Security Plan and were filed in response to Plaintiff's expert report (Doc. No. 56)."   (Doc. No. 89 at 1.) Further, the Court stated that "[u]pon the Court's review of the Facility Security Plan, it was apparent to the Court that Defendant had withheld the Facility Security Plan from Plaintiff despite its clear relevance to Plaintiff's previous discovery requests." (Id.)   The Court also stated that:

> [a]s previously determined by the Court in its April 17, 2019 Order, Plaintiff is entitled to depose or inquire of any witness, whether or not previously deposed or examined, on any matter that relates, directly or indirectly, to the Facility Security Plan, including, but not limited to, the contents, formulation, application, amendment, and maintenance of such Facility Security Plan or Defendant's failure to previously disclose such Facility Security Plan.

(Id. at 2.)   Accordingly, the Court directed Defendant "to comply with the Court's April 17, 2019 Order forthwith."   (Id.)

Thereafter, the Court granted Defendant's motion to extend the deadline for the conclusion of fact discovery and to reschedule the post-discovery conference.   (Doc. Nos. 90, 91.)   The Court conducted a post-discovery status conference with the parties on November 5,

2019, and thereafter issued a case management order setting a date of April 30, 2020 for the completion of expert discovery and a date of June 15, 2020 for the filing of any summary judgment motion.   (Doc. Nos. 94, 96.)   After several consent motions requesting an extension of time for the completion of expert discovery and the filing of any summary judgment motion, the Court issued an Order setting a deadline of September 15, 2020 for the filing of any summary judgment motion.   (Doc. No. 110.)

On August 20, 2020, Plaintiff filed the instant Motion for Costs (Doc. Nos. 115, 116), seeking to recover from Defendant costs and attorneys' fees incurred in connection with the reopening of discovery in this matter to obtain information related to Defendant's belatedly-disclosed Facility Security Plan.   After receiving an extension of time to respond, Defendant filed its response and brief in opposition to Plaintiff's motion on September 8, 2020. (Doc. Nos. 119, 120.)   Plaintiff filed his reply on September 18, 2020.   (Doc. Nos. 129, 130.) Accordingly, Plaintiff's motion is ripe for disposition.[1]

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 26(b) provides as follows regarding the scope of discovery available to the parties:

> [p]arties may obtain discovery regarding any nonprivileged matter that is relevant
> to any party's claim or defense and proportional to the needs of the case,
> considering the importance of the issues at stake in the action, the amount in
> controversy, the parties' relative access to relevant information, the parties'

---

[1] Defendant filed its Motion for Summary Judgment (Doc. No. 121), along with a supporting Brief (Doc. No. 122), on September 15, 2020, and its Concise Statement of Material Facts (Doc. No. 125), on September 16, 2020.   Pursuant to stipulation between the parties, Plaintiff filed his opposition to Defendant's Motion for Summary Judgment on October 26, 2020.   (Doc. Nos. 137-141.)   On November 9, 2020, the parties filed a consent motion for an extension of time for Defendant to file its reply to Plaintiff's brief in opposition.   (Doc. No. 142.)   The Court granted the motion (Doc. No. 143), and Defendant's reply to Plaintiff's brief in opposition was filed on November 23, 2020 (Doc. Nos. 144-45).

resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

See Fed. R. Civ. P. 26(b).   In addition, Federal Rule of Civil Procedure 26 requires a party to disclose a copy of all documents, within "its possession, custody, or control," which it "may use to support its claims or defenses," without awaiting a formal discovery request from the opposing party.   See Fed. R. Civ. P. 26(a)(1)(A)(ii).   A party must make those initial disclosures "based on the information then reasonably available to it."   See Fed. R. Civ. P. 26(a)(1)(E).   Federal Rule of Civil Procedure 26(e) explicitly requires a party to supplement a previous disclosure or response "if the party learns that in some material respect the disclosure or response is incomplete or incorrect."   See Fed. R. Civ. P. 26(e).

Federal Rule of Civil Procedure 37 authorizes a district court to impose sanctions against a party that does not provide discovery in accordance with the Federal Rules or a court order. See Fed. R. Civ. P. 37.   The purposes of Rule 37 include penalizing a culpable party or attorney and deterring others from engaging in similar conduct.   See Nat'l Hockey League v. Metro Hockey Club, Inc., 427 U.S. 639, 643 (1976).   Rule 37(c) permits the imposition of sanctions against a party who fails to disclose or supplement discovery pursuant to Federal Rules of Civil Procedure 26(a) and (e).

Rule 37 (c)(1) provides, in pertinent part:

> **Failure to Disclose or Supplement**. If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.   In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).   As provided in the rule, sanctions should not be imposed if a failure to disclose or supplement was "substantially justified."   "Substantial justification for the failure to make a required disclosure has been regarded as justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The test of substantial justification is satisfied if there exists a genuine dispute concerning compliance."   Claude Worthing Benedum Foundation v. Harley, No. 12-1386, 2014 WL 3614237, at *3 (W.D. Pa. July 22, 2014) (quoting Tolerico v. Home Depot, 205 F.R.D. 169, 175-76 (M.D. Pa. 2002)).[2]

The decision as to whether to impose sanctions under Rule 37, and a determination as to what sanction may be appropriate "are matters entrusted to the discretion of the district court." See Dufala v. Primanti Bros., No. 2:15-cv-00647, 2015 U.S. Dist. LEXIS 132964, at *2 (W.D.

---

[2] The Court notes that Plaintiff's motion also references 28 U.S.C. § 1927 as authority pursuant to which it seeks sanctions.   (Doc. No. 116 ¶¶ 7, 17.)   Section 1927 provides as follows:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.   However, despite Plaintiff's reference to Section 1927's authority to permit sanctions against counsel, the briefs of the parties appear to address Plaintiff's motion pursuant to Rule 37, which permits the imposition of sanctions only against a party, not counsel.   See Fed. R. Civ. P. 37(c); Grider v. Keystone Health Plan Central, 580 F.3d 119, 141 (3d Cir. 2009) (holding "that Rule 37(c)(1) does not permit sanctions against counsel").   Moreover, the Proposed Order submitted by Plaintiff in connection with his motion seeks an award of costs and fees against "Defendant Gateway Clipper."   (Doc. No. 116-19.)   The Court addresses Plaintiff's motion accordingly.

Pa. Sept. 30, 2015) (citing <u>Bowers v. Nat'l Collegiate Athletic Ass'n</u>, 475 F.3d 524, 538 (3d Cir. 2007)).

## III.   DISCUSSION

### A.   Arguments of the Parties as to Rule 37 Sanctions

In support of his motion, Plaintiff characterizes the "core" of the discovery dispute between the parties as rooted in "Defendant's denial of the existence, and withholding from productions of its security and access control policies and documentation until after the close of the original fact discovery period."   (Doc. No. 116 ¶ 3.)   Plaintiff maintains that Defendant's "discovery abuse caused Plaintiff to incur significant expenditures of time and vast monetary expenses, including those associated with his retained expert examining the documents and testimony then of record, which Defendant averred under oath to be the only relevant documents, reaching [his] opinions, and drafting his report based upon Defendant's false misrepresentations and testimony."   (<u>Id.</u> ¶ 4.)   As support for its motion seeking costs and fees, Plaintiff points to the cases of <u>Gateway Clipper v. Hill</u>, No. 2:05-cv-00985 (W.D. Pa. Oct. 18, 2006) and <u>Newill v. Campbell Transportation Co., Inc.</u>, No. 2:12-cv-01344-TFM, 2013 WL 6002349 (W.D. Pa. Nov. 12, 2013), which he maintains concerned similar discovery abuses by Defendant or Defendant's counsel.   (<u>Id.</u> at 2-7.)

Plaintiff characterizes Defendant's conduct as involving "the denial, after numerous requests and clarification of requests, of the existence of and the willful withholding of, 385 pages of responsive documents; the same being the only documents setting forth the relevant information regarding the Defendant Gateway Clipper's security and access control policies and procedures."   (<u>Id.</u> ¶ 20.)   Plaintiff maintains that, in connection with Defendant's August 31, 2018 admission that it possessed additional documents, Defendant argued that it had already

9

produced all relevant documents and that the documents still in its possession "did not contain security or access control procedures but were instead limited to anti-terrorism procedures."   (Id. at n.4.)   Plaintiff notes that, in connection with discovery in this matter, Defendant "initially offered sworn testimony, and representations in discovery responses, and through counsel, that it did not have any written security or access control policies."   (Id. ¶ 32.)   Plaintiff maintains that Defendant insisted that the additional documents in its possession did not contain "security procedures related to the permissible use(s) of Defendant's vessels, access to the vessels, security measures or alcohol and/or drug use," as all such documents had already been produced.   (Id. ¶ 35.)

Plaintiff notes that this Court has previously determined that Defendant withheld its Facility Security Plan "despite its clear relevance to Plaintiff's previous discovery requests." (Id. ¶ 37) (quoting Doc. No. 89 at 1).   Plaintiff states that, in connection with the reopened discovery period related to the belatedly-disclosed Facility Security Plan, Plaintiff deposed eight individuals, four of whom previously offered sworn deposition testimony in this matter and four who had not been previously deposed.   (Doc. No. 116 ¶ 39.)   Plaintiff maintains that the testimony offered by those individuals demonstrates that Defendant's failure to produce its security and access control policies was "an intentional choice made with full knowledge of the existence of relevant documents responsive to Plaintiff's discovery requests."   (Id. ¶ 40.)

Plaintiff summarizes that witness testimony, beginning with Michael Graham ("Graham"), Defendant's Rule 30(b)(6) Designee, who was initially deposed on April 25, 2017, stating that at his first deposition, when asked whether Defendant had security and access control policies, Graham testified that such policies did not exist, because if they did exist, they would be in Defendant's files, but he did not find any such policies in Defendant's files.   (Id. ¶¶

45-46.)   Plaintiff notes that, in response to the specific question "[i]s there any overnight dock security procedure that you are aware of that was in place at the time that the subject incident happened on July 20, 2014?", Graham responded in the negative.   (Id. ¶ 48.)   At his second deposition occurring during the reopened discovery period, Plaintiff notes that Graham admitted that Defendant has a Facility Security Plan for its dock and its vessels, detailed within its Alternative Security Plan ("ASP").   (Id. ¶ 53.)   Plaintiff argues that, despite previously testifying to the fact that Defendant did not have security and access control policies, at his second deposition Graham testified that he has been aware of the location of Defendant's ASP for the facility and for the Duchess for as long as he has been employed by Defendant.   (Id. ¶ 56.)   Plaintiff notes that Graham also testified as to the fact that Defendant's ASPs for the facility and its vessels relate to access to the vessels and the facility.   (Id.¶ 59.)   Graham testified that a copy of the Defendant's ASP is maintained aboard each of its vessels (including the Duchess) and in the office of the facility.   (Id. ¶ 57.)   Moreover, Plaintiff states that Graham "readily admitted that, pursuant to the mandatory terms of its own ASP, which apply overnight, the Gateway Clipper was required to lock down access points to the facility and vessels, to secure the vessels when not in service, and to lock down the front gate of the Gateway Clipper's facility."   (Id. ¶ 63.)   Plaintiff highlights the fact that Graham agreed in response to questioning that these lock down procedures are "day-to-day security requirements."   (Id. ¶ 67.)

Plaintiff next summarizes the testimony of Captain Stephen Jones ("Captain Jones"), who has held the position of Vessel Security Officer ("VSO") within Defendant's organization, and presently serves as VSO of the Empress.   (Id. ¶ 72.)   Plaintiff notes that, with regard to Defendant's ASPs, Captain Jones testified (in his second deposition) that Defendant's ASPs have existed since approximately 2004 or 2005, and that he was privy to them in his normal everyday

11

work for Defendant. (Id. ¶ 76.)   Plaintiff also notes that Captain Jones acknowledged that the ASP policies and procedures in effect at Maritime Security ("MARSEC") level 1 were normal everyday security procedures that govern day-to-day access to Defendant's vessels and facility. (Id. ¶ 77.)   Plaintiff notes that Captain Jones admitted that while the ASPs require the front gate of the facility to be locked, it is not always locked, and the same is true of Defendant's unmanned vessels.   (Id. ¶ 85.)

Plaintiff also references the testimony of Brian Krug ("Krug") offered in the period of reopened discovery.   Plaintiff states that Krug testified that he has been employed by Defendant since 1986 and is Defendant's Company Security Officer ("CSO"), charged with assuring Defendant's compliance with its ASPs.   (Id. ¶¶ 102, 103.)   Plaintiff notes that Krug testified to his understanding regarding the mandatory nature of the ASPs and that the provisions in those ASPs applicable to MARSEC level 1 constituted everyday procedures.   (Id. ¶ 104.)   Plaintiff maintains that Krug's testimony indicated that he is knowledgeable about the access control provisions of Defendant's ASPs and recognized that, in accordance with the ASPs, Defendant's vessels must be locked and secured when not in service, and access points to the facility should be locked as well.   (Id. ¶ 105.)   As Plaintiff notes, Krug's testimony indicated his awareness that, pursuant to the ASPs, allowing employees of Defendant to access Defendant's vessels when not in service to dance or drink alcohol was not a permissible use of the vessels.   (Id. ¶ 109.)

Plaintiff next references the testimony of Kathleen Denham-Wirginis, ("Denham-Wirginis") who is "Master" of the Duchess, and, at the time of the incident giving rise to this litigation, was the designated Facility Security Officer ("FSO") charged with securing the facility against unauthorized entry.   (Id. ¶ 113.)   As detailed by Plaintiff, Denham-Wirginis testified at her first deposition that she was unaware of any written documentation regarding

12

Defendant's access control policies.   (Id. ¶ 110.)   Plaintiff notes that, at her second deposition, Denham-Wirginis testified that she had seen Defendant's ASPs in the past and that she had reviewed those documents when she was an FSO for Defendant.   (Id. ¶ 116.)   In addition, Plaintiff notes that Denham-Wirginis testified that she understood that MARSEC level 1 procedures concern everyday security procedures.   (Id. ¶ 118.)

Plaintiff next addresses the testimony of Terrence Wirginis ("Wirginis"), who is the owner and president of Defendant, and was one of Defendant's Rule 30(b)(6) Designees.   (Id. ¶ 122.)   Plaintiff notes that, at his first deposition, Wirginis testified that there was no prohibition on intoxicated employees entering Defendant's facility and vessels.   (Id. ¶ 124.)   As Plaintiff notes, at his second deposition, Wirginis testified that Defendant's security responsibilities would be defined within the ASP but that he was unsure if that was the only document of Defendant that prescribed procedures applicable to overnight security.   (Id. ¶ 128.)   Wirginis also testified that MARSEC level 1 procedures are the day-to-day normal security measures that are always in effect.   (Id. ¶ 129.)   As noted by Plaintiff, Wirginis testified that the MARSEC standards (as contained in the ASP) are "impracticable to be held to."   (Id. ¶ 130.)

Plaintiff also references the testimony of Dan Lacek ("Lacek"), who participated in a deposition in the reopened discovery period.   Plaintiff notes that Lacek testified that he was employed by Defendant in a part or full-time capacity from 1983 through 2011, and that he was aware of the existence of Defendant's ASPs setting forth security and access control policies, in fact aiding in the drafting of those documents.   (Id. ¶¶ 134-36.)   Plaintiff points out that Lacek testified that the ASP provisions at MARSEC level 1 are intended to be "typical day-to-day operating" procedures, and noted that the ASP mandates that the front gate of the facility be locked.   (Id. ¶¶ 137-38.)

13

Finally, Plaintiff points to the testimony of Charles Larbig ("Larbig"), the individual who was charged with regulating access to Defendant's facility and vessels on the night of the incident giving rise to this litigation.   (Id. ¶ 146.)   Plaintiff notes that Larbig testified at his initial deposition that he never received any information or instruction regarding who was permitted onto Defendant's facility or vessels after operational hours, and that, to his knowledge, no such written guidelines or regulations existed.   (Id. ¶¶ 147-48.)   Accordingly, Larbig testified that he would use his discretion as to who would be permitted to access Defendant's facilities and vessels.   (Id. ¶ 149.)   At a second deposition during the reopened discovery period, Larbig again testified that, although he was the individual charged with enforcing the security and access control measures outlined within Defendant's ASPs at the time of the incident, he never reviewed the ASPs and had not seen or discussed any of the provisions contained in the ASPs.   (Id. ¶ 155.)   Larbig testified in the negative when asked whether he understood his responsibilities to include the monitoring and restricting of access to Defendant's vessels.   (Id. ¶ 156.)

After canvassing the above deposition testimony, Plaintiff discusses documents produced by Defendant to Plaintiff on October 10, 2019, which he views as documentary proof of Defendant's knowledge of its ASPs early in this litigation and of the fact that the information contained in the ASPs would lead any reasonable Defendant to conclude that it was required to produce the ASPs in response to Plaintiff's discovery requests.   (Id. ¶¶ 159-60.)   For example, Plaintiff explains that one of the documents produced by Defendant on October 10, 2019 is a document indicating that, on April 7, 2017, Defendant allegedly trained its employees on such topics as MARSEC levels, security breaches, restricted areas, CSO, VSO, and FSO.   (Id. ¶ 161.) Plaintiff also refers to another document indicating that, on April 7, 2017, Defendant conducted

14

security drills and training regarding such topics as "Knowledge of the ASP & Relevant Sections," and "MARSEC levels and changes made," and that the VSO handling the drills was Captain Jones.   (Id. ¶¶ 162-63.)

Plaintiff maintains that, in his first deposition on April 25, 2017, Graham, Defendant's Rule 30(b)(6) Designee, testified that Captain Jones had asked him whether any written security procedures existed (and Graham had replied that there were none) and that this testimony occurred a mere 18 days after Captain Jones apparently trained Defendant's employees on such written security procedures.   (Id. ¶¶ 164-65.)   Accordingly, Plaintiff argues that "[i]t is simply not possible that Defendant Gateway Clipper could have believed it was offering genuine, truthful testimony when it stated written policies and procedures regarding security and access control did not exist only a few weeks after it had conducted training drills and exercises involving security measures, access control, its ASPs," and also that "[i]t is not possible that Defendant could have believed it was offering genuine, truthful testimony when it swore that it had checked its physical files and did not locate these documents and that there was no other location where these documents would be stored."   (Id. ¶¶ 168-69.)

Plaintiff also references the testimony of his expert, Captain DiNapoli, who testified that, in preparing his initial September 6, 2018 report for Plaintiff, he would have wanted to review Defendant's Facility Security Plan and Vessel Security Plan for the Duchess, but that he had been advised that those plans did not exist, and had in fact reviewed testimony from Defendant indicating that such plans did not exist.   (Id. at 30-32.)   Accordingly, Plaintiff argues that Captain DiNapoli's testimony makes it "evident that he relied upon Defendant's misrepresentations when reaching his initial opinions and drafting his September 6, 2018 report." (Id. ¶ 173.)   Plaintiff maintains that "[a]fter Defendant finally provided its security and access

control policies and procedures, the same were utilized for all of the depositions set forth above,"

and that "[t]hese policies and procedures, and the depositions based upon the same, formulated

the basis for Captain DiNapoli's revised reports and opinions which were based upon the <u>actual</u>

facts of consequence as opposed to Defendant's initial misrepresentations."   (<u>Id.</u> ¶¶ 174-75.)   In

conclusion, Plaintiff maintains that "[t]he testimony of record, withheld documents, and

purported explanations for failing to produce and/or timely supplement these crucial materials all

<u>strongly</u> evidence that Defendant Gateway Clipper's failure to disclose was not 'substantially

justified.'"   (<u>Id.</u> ¶ 176.)

  In opposing Plaintiff's motion for costs, Defendant argues that it reasonably responded to

Plaintiff's discovery requests, and relies on the argument that, because security plans

implemented in accordance with MTSA (like Defendant's ASPs) are intended to deter terrorist

activity, which was not at issue in this case, Defendant reasonably interpreted Plaintiff's requests

for Defendant's security and access control policies as requests for all security and access control

policies <u>except</u> those implemented in accordance with MTSA.   (Doc. No. 120 at 7-8.)

Specifically, Defendant argues that "[i]n interpreting and responding to [Plaintiff's] discovery

requests, [Defendant] reasonably relied on the relevant MTSA statutes and regulations, which

provide that MTSA Security Plans are intended to apply to security measures taken to deter

terrorist activity."   (<u>Id.</u> at 7.)   Defendant argues that "MTSA was enacted in the wake of the

September 11, 2001 terrorist attacks to address maritime transportation security and to deter

potential 'transportation security incidents,' defined as 'security incident[s] resulting in a

significant loss of life, environmental damage, transportation system disruption, or economic

disruption in a particular area.'"   (<u>Id.</u> at 7-8) (quoting 46 U.S.C. § 70101(6); <u>Cassidy v. Chertoff</u>,

471 F.3d 67, 70 (2d Cir. 2006)).   Defendant maintains that security plans and ASPs developed

to comply with MTSA "are intended to provide procedures that can be undertaken by vessel operators, crew, and other company employees in the event of a suspected or actual terrorist attack," and therefore have no applicability "in a situation involving the drowning death of a heavily intoxicated off-duty employee who returned to a vessel after drinking and socializing at a local bar after work."   (Id. at 8.)

Accordingly, Defendant maintains that "[u]ntil [Plaintiff] clarified that he sought Gateway Clipper's MTSA security plans, it was reasonable for Gateway Clipper and its Rule 30(b)(6) witness Michael Graham to consider MTSA mandated anti-terrorism procedures as wholly apart and separate from the safety procedures Gateway Clipper implemented for the day-to-day protection of persons on its landing; persons aboard its vessels; and its vessels." (Id.)   Defendant asserts that, at his April 25, 2017 deposition, Graham "properly and truthfully responded to considerable questioning pertaining to procedures for accessing the Gateway Clipper landing and vessels during non-business hours," and "his answers to all questions posed to him on April 25, 2017 provide a substantially justifiable reason as to why Gateway Clipper did not produce its ASPs prior to [Plaintiff's] express request of August 16, 2018 for the same." (Id. at 8-9.)   Defendant argues that because Plaintiff's counsel was unaware of the requirements of MTSA until advised of those requirements by his expert Captain DiNapoli (and therefore did not specifically inquire about them), he could not expect that Graham in his deposition or Defendant in its response to Plaintiff's initial November 2016 discovery requests would refer to or disclose security policies enacted to comply with MTSA.   (Id. at 9.)   Defendant maintains that it reasonably interpreted Plaintiff's complaint and theories of liability and discovery requests to indicate that only its "day-to-day safety procedures were in issue" and therefore it did not "willfully withhold discoverable information."   (Id. at 9.)   Defendant argues that it produced all

17

security and safety documents it reasonably believed to be responsive to such discovery requests and notes that it produced the "Employee Handbook and Deckhand Training Manual," which includes "Man Overboard" procedures.   (Id.)

Defendant specifically contests Plaintiff's arguments that: (1) Defendant should have produced its ASPs as part of its initial disclosures; (2) Defendant should have produced its ASPs in response to Plaintiff's discovery requests; and (3) Defendant should have produced its ASPs because a "lay understanding" of safety procedures would dictate such production.   (Id. at 10.) As to the first point, Defendant maintains that it did not have "notice" that the basis of Plaintiff's claims would "implicate anti-terrorist security measures set forth in the ASP" so as to require it to produce such documents in connection with its initial disclosures.   (Id.)

Defendant next contends that it was "not required to produce its ASPs in response to [Plaintiff's] requests for production of documents because [Defendant] reasonably interpreted its ASPs to be outside the scope of such requests."   (Id. at 10.)   Defendant disputes Plaintiff's assertion that it should have produced its ASPs in response to Plaintiff's Request for Production of Documents Number 23, which sought "[a]ll documents to support the factual information and/or the source of such information supporting Defendant's contentions as reflected in Defendant's Answer, other pleadings, or responses to discovery requests."   (Id.)   Defendant states that it objected to this request on November 28, 2016, and Plaintiff never challenged its objection.   (Id.)   Moreover, Defendant maintains that it "did not intend to rely on its ASPs in its defense," and that "[i]t was not until [Plaintiff] placed MTSA compliance in issue with the filing of Mr. DiNapoli's inaccurate report on September 7, 2018 that [Defendant] was compelled to respond with its own expert reports challenging Mr. DiNapoli's incorrect opinions."   (Id. at 11.)

Third, Defendant maintains that "a reasonable lay interpretation of a request for 'safety

procedures' would not reasonably include a request for the production of anti-terrorism security

procedures specifically designed to prevent, *inter alia*, 'significant loss of life' events," and the

reasonable interpretation of Plaintiff's document requests was that Plaintiff "was seeking copies

of any written, day-to-day overnight dock security procedures," which Defendant maintains do

not include its ASPs.  (<u>Id.</u>)

      Defendant contends that it has "fully complied with all discovery duties, requirements,

and obligations under the Federal Rules of Civil Procedure."  (<u>Id.</u> at 12.)   It maintains that

"[t]he duty to supplement under Rule 26(e)(2) 'does not require a party to volunteer information

that was not encompassed within the scope of an earlier discovery request.'" (<u>Id.</u>) (quoting

<u>Bowers v. NCAA</u>, 475 F.3d 524, 540 (3d Cir. 2007)).   Defendant reiterates that in responding to

Plaintiff's discovery requests, and in offering the testimony of its Rule 30(b)(6) witness, it "was

substantially justified in interpreting [Plaintiff's] theories of the case and prior discovery requests

to indicate that [Defendant's] day-to-day safety procedures were in issue, rather than

anti-terrorism measures implemented in compliance with MTSA."  (<u>Id.</u> at 12-13.)

      Defendant maintains that it did not: make any false representations in connection with the

discovery process; provide false testimony under oath; or in any way engage in bad faith in

connection with the discovery process in this case.  (<u>Id.</u> at 13.)   In support of its position,

Defendant argues that Graham, its Rule 30(b)(6) Designee, "never denied the existence of

[Defendant's] ASP" in his April 25, 2017 testimony, stating that the extent of his testimony was

that Defendant did not have "overnight dock security procedures."  (<u>Id.</u>)   Defendant asserts that

its position remains that it does not have "overnight dock security procedures," and that the

parties "differ in their interpretation of 'security procedure,' 'safety procedure,' 'safety plan' and

the like."  (<u>Id.</u> at 13-14.)   Defendant argues that, absent a definition of the terms "security" or

"safety," Defendant was "entitled to rely on its reasonable interpretation of the Rule 30(b)(6)

Notice – in conjunction with [Plaintiff's] theories of the case, discovery requests, and MTSA

provisions and regulations – in attempting to ascertain the scope and nature of [Plaintiff's]

request."   (Id. at 14.)   Defendant maintains that Graham "never testified that [Defendant's] ASP

did not exist," and cannot be said to have denied the existence of the same at his April 25, 2017

deposition since "he was never asked about the ASPs."   (Id. at 14.)

Defendant further argues that testimony of additional witnesses of Defendant "indicates a

universal misunderstanding of [Plaintiff's] term 'overnight dock security procedures,' which

does not evidence bad faith by [Defendant]."   (Id. at 15.)   Defendant points to the testimony of

Brian Krug, Dan Lacek, and Andrew McDevitt and argues that "despite 'admitting' the existence

of the ASP and forthrightly answering questions regarding the same to the best of their

recollection, there was still significant confusion over the 'existence' of 'overnight dock security

procedures.'"   (Id. at 17.)   Defendant maintains that "[t]he cumulative testimony indicates that

[Defendant's] witnesses had a different interpretation of 'overnight dock security procedures'

than [Plaintiff] and that [Defendant] does not have overnight passengers, as contemplated by

MTSA and other relevant Coast Guard regulations."   (Id. at 18.)   Further, Defendant maintains

that because Captain Jones "did not recall a conversation with Mr. Graham that took place 4-5

years prior to his deposition" does not mean that he was "lying about the conversation taking

place."   (Id.)

Defendant asserts that the fact "[t]hat witnesses interpret the same questions differently,

have different recollections, or different interpretations of common facts simply reflects that the

sworn testimony of witnesses vary," but "does not give credence to [Plaintiff's] suggestion that

one, many, or all of the witnesses are per se lying."   (Id.)   Accordingly, Defendant maintains

that Plaintiff "has not put forth evidence to support his conjecture that [Defendant] knowingly provided false testimony under oath; repeatedly denied the existence of the ASPs; and intentionally gamed the discovery process to its own advantage," arguing that "[o]n the contrary, [it] "reasonably concluded that the discovery requests and deposition questions by [Plaintiff] were not intended to obtain documents or elicit testimony regarding Sensitive Security Information designed to protect against terrorist attacks on the United States marine industry," and therefore that it was substantially justified in its position.   (Id. at 19.)

Further, Defendant takes issue with the precedent cited by Plaintiff in support of his motion – specifically, Gateway Clipper v. Hill and Newill v. Campbell Transportation Company Inc. – arguing that "[t]he sole purpose of [Plaintiff's discussion of] these cases is an attempt to tarnish [Defendant's] credibility by creating the inaccurate appearance of a pattern of behavior before the trier of fact."   (Id.)   Defendant characterizes Hill as involving a situation where Defendant "inadvertently overlooked potentially relevant documents in the course of discovery," and [u]pon discovery of the documents, "immediately produced the documents, within the deadline for the completion of fact discovery."   (Id.)   Defendant argues that here, as in Hill, "when [Plaintiff] clarified that he was seeking [Defendant's] MTSA anti-terrorism ASPs, [Defendant] acknowledged within 15 days that such plans existed and explained why they could not be produced."   (Id. at 20.)

As to Plaintiff's citation to Newill, a case in which the defendant was represented by Defendant's counsel here, Defendant states that in that case, Judge McVerry determined that the defendant should have contacted a retired employee to ascertain whether he or she had any relevant documents; however, Defendant maintains that Defendant's counsel in that case "did not believe its duty to investigate extended so far, particularly when the specific retired employee

21

in question was only in possession of (1) documents that had already been produced and (2) three

new photographs unknown to [the defendant in that case]."   (Id. at 20-21.)   Accordingly,

Defendant argues that, because the instant situation does not involve obtaining documents from a

retired employee, the case is irrelevant to the issues before the Court.   (Id. at 21.)

     Defendant characterizes this discovery dispute as involving a "difference of opinion with

respect to how the parties interpreted the scope of [Plaintiff's] discovery requests and deposition

questions," reiterating its position that "[i]t was reasonable for [Defendant] to interpret

[Plaintiff's] requests and questions pertaining to its day-to-day safety procedures for protecting

persons on its landing, persons on its vessels, and its fleet of vessels, rather than the

anti-terrorism security measures contained in the ASP in compliance with MTSA," and arguing

that there is no basis for a finding of bad faith on its part, making an award of costs

inappropriate.   (Id. at 21.)

     Defendant also maintains that this Court should deny Plaintiff's Motion for Costs

"because [Plaintiff] failed to take any reasonable, necessary, or timely steps to avoid incurring

excessive costs related to the discovery dispute that he created involving [Defendant's] ASPs."

(Id. at 22.)   The gist of Defendant's argument in this regard is its contention that, on August 31,

2018, "[Plaintiff] was advised by [Defendant] that the ASPs constituted non-discoverable

Sensitive Security Information"; however, "[r]ather than raising the matter and the deadline for

filing his expert reports with the Court by an informal telephone call, filing a formal motion for

protective order, or request for emergency conference pursuant to Local Rule 37.1, [Plaintiff]

chose none of these options."   (Id. at 24.)   Defendant argues that "[i]nstead, [Plaintiff]

proceeded with filing the erroneous DiNapoli report on September 7, 2018."   (Id.)   Defendant

questions "why [Plaintiff] chose not to relay [Defendant's] August 31, 2018 correspondence –

22

wherein the existence of [Defendant's] ASPs was confirmed – to Mr. DiNapoli, his liability

expert."   (Id.)   Defendant argues that, in the eight days between the August 31, 2018

correspondence referenced by Defendant and the filing of Captain DiNapoli's report, Plaintiff

should have confirmed to Captain DiNapoli that Defendant did in fact have a "Facility Security

Plan."   (Id. at 25.)   Based on this correspondence, Defendant maintains that [Plaintiff] had

"sufficient time to seek relief from this Court regarding the discovery dispute over the ASPs,"

but chose not to do so, and permitted the filing of Captain DiNapoli's report on September 7,

2018.  (Id. at 26.)   Accordingly, Defendant argues that "[Plaintiff] should not now be permitted

to financially benefit from his decisions in August and September 2018 to avoid pursuit of any

avenue of available court intervention to resolve this discovery dispute, despite having ample

opportunity to do so."   (Id.)

### B.      Whether Plaintiff's Request for a Rule 37 Sanction Should be Granted

Upon careful consideration of Plaintiff's motion, Defendant's response thereto, the

exhibits filed in connection with the motion, and the relevant authorities, the Court is persuaded

that Plaintiff is entitled to an award of costs and fees as a sanction pursuant to Federal Rule of

Civil Procedure 37 in connection with Defendant's belatedly-disclosed "Facility Security Plan,"

and the additional discovery and revision of expert reports necessitated by that belated

disclosure.   As the parties are aware and as detailed more fully above, this Court previously

found, upon an in camera examination of Defendant's Facility Security Plan in January 2019,

that Plaintiff was entitled to discovery related to the Facility Security Plan maintained by

Defendant in accordance with MTSA and disclosed by Defendant to Plaintiff on or about

November 8, 2018.   (Doc. No. 79.)   The Court's Order reopening discovery in this case

permitted the parties to "obtain discovery from any witness, whether or not previously deposed,

23

who may be in possession of information related to the Facility Security Plan."   (Doc. No. 83 at

2.)   When the Court issued its Order reopening discovery on April 17, 2019, the Court held for

another day a decision on which party should properly bear the costs of that additional discovery,

providing at the time that "[a]ll fees, expenses, and/or costs of such discovery shall remain the

burden of the party who would typically bear the same under the Federal Rules of Civil

Procedure and/or applicable precedent until further Order of Court."   (Id.)

After Defendant failed to comply with the Court's April 17, 2019 Order for over two

months and make available its Rule 30(b)(6) Designee and several other witnesses for deposition

during the reopened discovery period, Defendant proceeded to file a Motion for Protective Order

seeking the Court's assistance in preventing the very discovery that the Court had ordered to

occur more than two months earlier.   (Doc. No. 87.)   The Court unsurprisingly denied the

motion and again stated its position that, after review of Defendant's Facility Security Plan in

January 2019, "it was apparent to the Court that Defendant had withheld the Facility Security

Plan from Plaintiff despite its clear relevance to Plaintiff's previous discovery requests."   (Doc.

No. 89 at 1.)   In its July 17, 2019 Order, the Court directed Defendant "to comply with the

Court's April 17, 2019 Order forthwith."   (Id. at 2.)

Against this backdrop, and in accordance with its previous findings regarding this

discovery dispute, the Court cannot conclude that Defendant's failure to disclose the Facility

Security Plan to Plaintiff during the original discovery period in connection with its initial

disclosures, its responses to requests for production, or the testimony offered by its Rule 30(b)(6)

Designee was substantially justified.   See Fed. R. Civ. P. 37(c)(1).   As noted above,

"[s]ubstantial justification for the failure to make a required disclosure has been regarded as

justification to a degree that could satisfy a reasonable person that parties could differ as to

24

whether the party was required to comply with the disclosure request."   See Claude Worthing

Benedum Foundation, 2014 WL 3614237, at *3 (quotation omitted).

Here, Plaintiff's initial complaint in this matter articulated its theory of this case, which

involves Defendant's alleged failure to fulfill its "legal responsibility of providing security

including access control for its premises and property."   (Doc. No. 1 ¶ 40.)   As noted by

Plaintiff, Defendant did not disclose or provide its Facility Security Plan in its Rule 26 initial

disclosures, in response to Plaintiff's First Request for Production of Documents, or in response

to Plaintiff's Amended Notice of Deposition of Corporate Designee(s) Pursuant to Rule 30(b)6)

which requested "[a]ll safety policies related to . . . safety procedures related to the permissible

use(s) of Defendant's vessels, access to the vessels, security measures. . . ."   (Doc. No. 129 at

2-3.)[3]

The Court finds that Defendant's position that it failed to disclose and produce its Facility

Security Plan earlier in this litigation because any request by Plaintiff for "safety policies,"

"safety procedures related to. . . access to the vessels," and "security measures" of Defendant did

not fairly encompass anti-terrorism security procedures, as such procedures apply only in

connection with the prevention of "significant loss of life" events (see Doc. No. 120 at 8-11),

was not "substantially justified."   Defendant's position that "it was reasonable for [Defendant]

and its Rule 30(b)(6) witness Michael Graham to consider MTSA mandated anti-terrorism

procedures as wholly apart and separate from the safety procedures [Defendant] implemented for

---

[3] Defendant's argument that it did not disclose the documents prior to Plaintiff's August 16, 2018 explicit request for them because Plaintiff failed to request the documents by name completely misapprehends the nature of the parties' discovery obligations imposed by Federal Rule of Civil Procedure 26(a), which does not require a party to request discoverable documents by name.   See Newill, 2013 WL 6002349, at *6 (stating that "CTC misapprehends the standard imposed by Rule 26(a) for 'the burden does not fall on plaintiff to learn whether, how and where

the day-to-day protection of persons on its landing; persons aboard its vessels; and its vessels" (see id. at 8) is thoroughly undermined by the belatedly-offered testimony of its own witnesses, which reveals that the Facility Security Plan, and the ASPs for Defendant's vessels and facility, govern "day-to-day security procedures" applicable to Defendant's facility and vessels.

For example, although at his initial deposition Defendant's Rule 30(b)(6) Designee, Graham, responded in the negative to the question "[i]s there any overnight dock security procedure that you are aware of that was in place at the time that the subject incident happened on July 20, 2014?", Graham testified at his second deposition that Defendant's ASPs for the facility and its vessels relate to access to the vessels and the facility, and that he had been aware of the ASPs for the entirety of his employment with Defendant.   (Doc. No. 116 ¶¶ 48-57.) Moreover, Graham testified that, pursuant to the mandatory terms of its own ASPs, which are applicable overnight, Defendant was required to lock down access points to the facility and vessels, and that these lock down procedures are "day-to-day security requirements."   (Id. ¶¶ 63, 67.)

With regard to the testimony of other witnesses of Defendant, Plaintiff notes that Captain Jones also testified to his awareness of Defendant's ASPs, which he was privy to in his normal everyday work for Defendant; furthermore, he acknowledged that the ASP policies and procedures in effect at MARSEC level 1 were security procedures that governed day-to-day access to Defendant's vessels and facility.   (Id. ¶¶ 76-77.)   Plaintiff also notes that Brian Krug, Defendant's CSO charged with assuring Defendant's compliance with its ASPs, testified as to his understanding of the mandatory nature of the provisions of the ASPs, and that the provisions contained in the APSs applicable to MARSEC level 1 constituted everyday procedures.   (Id. ¶¶

Defendant keeps relevant documents'") (internal citation omitted).

102-05.)   Defendant's witness Denham-Wirginis, the designated FSO charged with securing

Defendant's facility at the time of the incident giving rise to this litigation against unauthorized

entry, also testified at her second deposition that the MARSEC level 1 procedures contained in

Defendant's ASPs concerned everyday security procedures.   (Id. ¶¶ 113-18.)   These witnesses

testifying during the reopened discovery period offered substantially similar testimony regarding

the "day-to-day" or "everyday" nature of the security procedures mandated pursuant to

Defendant's ASPs and designed to prevent unauthorized entry onto Defendant's facility or

vessels so as to aid in preventing a potential terrorist attack.   (Id. ¶¶ 129, 137-38.)

        This testimony of Defendant's witnesses has the benefit of comporting with any common

sense understanding of statutorily-mandated security procedures designed to prevent a terrorist

attack, because if such procedures are not intended to apply every day, and in fact are not applied

on a "day-to-day" basis, such procedures will not be at all effective in potentially preventing a

terrorist attack.   Accordingly, in light of the testimony of its own witnesses as to the "everyday"

or "day-to-day" nature of the security procedures mandated by Defendant's Facility Security

Plan, and in view of a common sense understanding of how statutorily-mandated security

procedures (like Defendant's Facility Security Plan) must be applied in order to prevent a

"significant loss of life" event, the Court finds that Defendant's failure to disclose or produce its

Facility Security Plan in response to Plaintiff's requests for "overnight dock security procedures"

during the initial period of discovery, or in response to Plaintiff's Notice of Deposition of

Defendant's Rule 30(b)(6) Designee requesting "[a]ll safety policies related to . . . safety

procedures related to the permissible use(s) of Defendant's vessels, access to the vessels, security

measures" – because it viewed such requests as seeking everything except its MTSA-mandated

Facility Security Plan – was not substantially justified.   Accordingly, the Court finds that

Plaintiff is entitled to an award of costs and fees as a sanction under Federal Rule of Civil

Procedure 37(c)(1).[4]

In connection with the briefing on Plaintiff's motion for costs and attorneys' fees,

Plaintiff and Defendant both spend a significant amount of time opining about why Defendant

failed to disclose or produce this discoverable information during the initial discovery phase of

this litigation.   Plaintiff characterizes Defendant's failure to disclose or produce this

discoverable information as an intentional choice made in bad faith, while Defendant argues that

its failure to disclose or produce these documents resulted from its reasonable "interpretation" of

Plaintiff's requests.   Whatever the actual motivation of Defendant or Defendant's counsel in

failing to disclose the existence of or to produce Defendant's Facility Security Plan until after the

discovery period closed in this matter, and then only by way of its own expert reports in an effort

to rebut Plaintiff's expert Captain DiNapoli's conclusion that Defendant was not in compliance

with MTSA due to its stated lack of "written day-to-day overnight dock 'safety procedures

---

[4] The Court finds Defendant's argument that Plaintiff failed to take reasonable steps to avoid
increased costs associated with Captain DiNapoli's initial expert report to be unavailing.   As
noted above, Defendant maintains that, upon notice that Defendant's ASPs contained
non-discoverable Sensitive Security Information, Plaintiff failed to take appropriate steps and
instead "proceeded with filing the erroneous DiNapoli report on September 7, 2018."   (Doc. No.
120 at 24.)   On the contrary, Plaintiff maintains that, upon Defendant's August 31, 2018 notice
to Plaintiff that it had withheld certain documents but that those documents contained only
anti-terrorism procedures, Plaintiff communicated to Captain DiNapoli Defendant's stated
position that it had "already produced all of its 'safety procedures related to the permissible
use(s) of Defendant's vessels, access to the vessels, security measures, and alcohol and/or drug
use" (see Doc. No. 61-9 at 2), as sought by Plaintiff's amended notice of Rule 30(b)(6)
deposition.   (Doc. No. 129 at 6-8.)   Captain DiNapoli thereafter opined in his report that if, as
represented by Defendant, its withheld Facility Security Plan and Vessel Security Plans did not
contain everyday security and access control procedures, such plans would not be in compliance
with MTSA.   The Declaration of Captain DiNapoli, submitted by Plaintiff in connection with
his reply brief confirms that sequence of events.   (See Doc. No. 132 at 2.)   The Court is
persuaded that Plaintiff did not unnecessarily increase its costs in this matter by any failure to
communicate with Captain DiNapoli.   (See id.)

related to the permissible use(s) of Defendant's vessels, access to the vessels, security measures, and alcohol and/or drug use'" (see Doc. No. 61-9 at 2) – whether it was bad faith or incompetence – the Court need only find, as it has, that such failure was not "substantially justified" in order to conclude that a sanction pursuant to Rule 37(c)(1) is appropriate.  See Sun River Energy, Inc. v. Nelson, 800 F.3d 1219, 1227 (10th Cir. 2015) (stating that, while a court's inherent power provides authority to sanction only for bad faith conduct, "Rule 37(c)(1) requires only the absence of substantial justification – a less stringent standard"); Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2nd Cir. 2006) (holding that "[s]ince Rule 37(c)(1) by its terms does not require a showing of bad faith . . . such a requirement should not be read into the Rule"); Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co., 318 F.2d 592, 596 (4th Cir. 2003) (same).[5]

Along those same lines, the Court's finding is not based on any conclusion regarding a course or pattern of discovery abuse by Defendant or Defendant's counsel in other cases, as suggested by Plaintiff by way of his reference to Gateway Clipper v. Hill, No. 2:05-cv-00985 (W.D. Pa. Oct. 18, 2006) and Newill, 2013 WL 6002349 (W.D. Pa. Nov. 12, 2013), which Plaintiff maintains concerned similar discovery abuses by Defendant or Defendant's counsel. Rather, the Court's conclusion here is based solely on the conduct of Defendant in this case. Having determined that an award of fees and costs is appropriate as a sanction pursuant to Rule 37, the Court turns to the reasonableness of Plaintiff's requested fees and costs.

### C.      Reasonableness of Plaintiff's Requested Fees and Costs

---

[5] However, the Court notes that some of Defendant's conduct in connection with this discovery dispute – for example, Defendant's filing of a Motion for Protective Order after the Court's reopening of discovery in this matter seeking to prevent discovery related to the Facility Security Plan that the Court had ordered to occur – is not inconsistent with Plaintiff's allegations of bad

### 1.     Legal Standard

"The starting point for determining the amount of a reasonable fee is the lodestar, which courts determine by calculating the 'number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'"   McKenna v. City of Philadelphia, 582 F.3d 447, 455 (3d Cir. 2009) (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)).   A party seeking an award of fees bears the burden of demonstrating the reasonableness of its request.   See Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694, 703 n.5 (3d Cir. 2005).   Therefore, "the fee petitioner must submit evidence supporting the hours worked and rates claimed."   See id. (quotations omitted).   Any party opposing a fee request must "challenge by affidavit or brief with sufficient specificity to give fee applicants notice, the reasonableness of the requested fee."   See Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990).

In reviewing the hours worked and rates claimed, the following guidelines apply.   With regard to the hours worked, the Court must "review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are 'excessive, redundant, or otherwise unnecessary.'"   See Pub. Interest Research Grp. of N.J., Inc. v. Windall, 51 F.3d 1179, 1188 (3d Cir. 1995) (quoting Hensley, 461 U.S. at 433).   "In reviewing whether the number of hours in a fee application are reasonable, the Court must conduct a thorough and searching analysis, and it is necessary that the Court go line, by line, by line, through the billing records supporting the fee request."   Wachtel v. Health Net. Inc., No. 01-4183, 2007 WL 1791553, at *2 (D.N.J. June 19, 2007) (quotations omitted).   With respect to the billing rate claimed, "a reasonable hourly rate is calculated according to the prevailing market rate in the relevant community."   See Maldonado v. Houstoun, 256 F.3d 181,

---

faith.

184 (3d Cir. 2001).

As to Plaintiff's request for costs, district courts in this Circuit have awarded costs and expenses pursuant to Rule 37 upon a finding that they are "directly attributable to the conduct that is the subject of the sanctions [o]rder."   See Kaisha v. Lotte Int't America Corp., No. 15-5477, 2019 WL 5079571, at *4 (D.N.J. Oct. 10, 2019); Miller v. Thompson-Walk, No. 15-1605, 2019 WL 2150660, at *5 (W.D. Pa. May 17, 2019) (adopting Special Master's recommendation to award "deposition costs, travel and other deposition-related expenses" as a discovery sanction under Rule 37); Campbell-Bieber v. May, No. 07-827, 2008 WL 4072587, at *3 (M.D. Pa. Aug. 27, 2008) (awarding train travel and court reporter expenses as a discovery sanction pursuant to Rule 37).

### 2.    Arguments of the Parties

Plaintiffs' motion seeks costs and fees in the total amount of $67,614.73.   (Doc. No. 116-19.)   That figure consists of costs in the amount of $28,670.23, which Plaintiff represents were incurred "solely as the direct result of Defendant's misrepresentations regarding security and access control policies and documentation and its withholding of documents regarding the same."   (Doc. No. 116 ¶ 183.)   Plaintiff asserts that such expenses consist of: (1) court reporter fees and videographer fees associated with depositions of previously deposed individuals and Defendant's Rule 30(b)(6) Designee pertaining solely to security and access control policies; (2) court reporter fees and videographer fees associated with depositions of individuals whose identities became known and whose import became apparent as a result of Defendant's belatedly-disclosed security and access control policies; (3) expert witness fees of Captain DiNapoli related to his review of the belatedly-disclosed documentation and the above deposition testimony; and (4) expert witness fees of Captain DiNapoli related to drafting of his

report due to the belatedly-disclosed security and access control policies.   (Id. ¶ 187.)

Plaintiff's motion also seeks $38,944.50 in attorneys' fees that he maintains were incurred as a result of Defendant's belatedly-disclosed security and access control policies and procedures.   Plaintiff's submission includes several pages of detailed attorney time entries, amounting to 160.2 hours, reflecting the time expended by Attorney Jason Schiffman and another attorney associated with his firm in connection with additional discovery and expert consultation, as well as the preparation of this motion, resulting from Defendant's belatedly-disclosed security and access control policies and procedures.   (Id. at 35-38.) Plaintiff notes that, if his counsel were to litigate this matter on an hourly basis, Plaintiff's counsel's time would be billed at either $275.00 per hour or $305.00 per hour, depending on whether the time was spent preparing for depositions or drafting motions and discovery, or was spent taking depositions or appearing in court.   (Id. ¶¶ 192-93.)   Plaintiff represents that these amounts are in accordance with prevailing market rates for an attorney of his counsel's experience.   (Id. ¶¶ 194-97.)   Accordingly, Plaintiff seeks reimbursement of attorneys' fees of $38,944.50 expended "as a direct result of Defendant's conduct."   (Id. ¶ 212.)   Plaintiff reiterates that through his motion, he seeks only the "actual expenses incurred as a result of Defendant's misconduct and the actual attorney's fees resultant from Plaintiff's attempts to remedy the harm caused by this misconduct and the drafting of the subject Motion presenting before this Court," and not any "additional monetary sanction, or any other relief."   (Id. ¶¶ 214-15.)

In response, Defendant reiterates its position that it "has set forth substantial and justifiable reasons for not producing the ASPs prior to [Plaintiff's] August 16, 2018 request," and maintains that Plaintiff "has not established that [Defendant] acted willfully or in bad faith with

respect to the ASPs."   (Doc. No. 120 at 26.)   In addition, Defendant maintains that, "[t]o the

extent this Court deems relief appropriate, [it] believes that the time entries submitted by plaintiff

are unreasonable as to the amount of time expended, the nature of the time entries, and the

manner in which [Plaintiff's] fees are calculated."   (Id. at 27.)   However, Defendant offers no

specific examples of time entries that it considers to be unreasonable.   Instead, Defendant

"requests leave to conduct discovery and have an evidentiary" hearing on Plaintiff's fee request.

(Id.)

        As a general matter, Defendant asserts that Plaintiff's stated fees and costs are not

reasonable, because: (1) "the asserted costs are not reasonably specific"; (2) Plaintiff "is not

entitled to recover costs incurred related to Mr. DiNapoli's expert report, supplemental expert

report, or reviewing of additional materials" because Defendant reiterates his argument

(previously addressed supra by the Court) that Plaintiff filed Captain DiNapoli's initial expert

report "despite having sufficient time to seek court intervention as necessary to avoid

unnecessary expert fees in re-evaluating the case following [Plaintiff's] disclosure of material

information to his expert"; and (3) Plaintiff "is not entitled to recovery of costs and attorney's

fees with respect to depositions of 'newly identified' witnesses," namely Dan Lacek, Brian Krug,

Andrew McDevitt, and Steve Jones, because Defendant maintains that three of the witnesses

were mentioned by Graham in his first deposition, and therefore, "[a]ll four witnesses were

readily identifiable and available for deposition."   (Id. at 27-28.)   Defendant argues that it

should not have to pay expenses associated with the deposition of these four witnesses because

"[i]f [Defendant] had produced its ASPs on 'Day 1' of this litigation, [Plaintiff] would have

borne the costs to depose those witnesses.   (Id. at 28.)

        **3.      Analysis**

33

As an initial matter, the Court notes that while Rule 37 requires "an opportunity to be heard" by the potentially sanctionable party, see Fed. R. Civ. P. 37(c)(1), that opportunity to be heard does not extend to the right to an evidentiary hearing in every case.   See Sun River Energy, Inc. v. Nelson, 800 F.3d 1219, 1230 (10th Cir. 2015) (stating that "[a]n opportunity to be heard does not require an oral or evidentiary hearing on the issue, the opportunity to fully brief the issue is sufficient to satisfy due process requirements") (quotation omitted).   The Court finds an evidentiary hearing to be unnecessary here prior to awarding costs and fees, given the detailed nature of Plaintiff's submissions, and the lack of specificity of Defendant's objections to Plaintiff's submissions, especially with regard to Defendant's challenge to Plaintiff's attorneys' time entries and billing rates, where Defendant states only that it "believes that the time entries submitted by plaintiff are unreasonable as to the amount of time expended, the nature of the time entries, and the manner in which [plaintiff's] fees are calculated."   (Doc. No. 120 at 27.)

Upon careful review of the parties' arguments and the exhibits submitted by Plaintiff in support of his request, the Court finds that the fees and costs incurred by Plaintiff as a result of Defendant's belated disclosure of its Facility Security Plan and presented to the Court by way of the instant motion are reasonable.   With regard to the attorneys' fees sought by Plaintiff and necessitated by Defendant's failure to disclose its Facility Security Plan or accurately describe its contents until after the close of fact discovery and the completion of Captain DiNapoli's expert report, the Court first addresses the hours expended by Plaintiff's attorneys and sought to be reimbursed by way of this motion, which amount to 160.2 hours of attorney time.   (Doc. No. 116 at 35-38.)   The Court has carefully reviewed the detailed time entries presented to it, which consist primarily of time spent by Attorney Jason Schiffman, but also include minimal time spent by Attorney Roni Schiffman.   The time entries relate to: Plaintiff's efforts to respond to

Defendant's motion for protective order pertaining to the Facility Security Plan; conference with the Court regarding the disclosure of the Facility Security Plan; the drafting of a proposed Order for the Court governing the reopened discovery period; the preparation of emails to and review of emails from Defendant's counsel regarding efforts to coordinate the completion of discovery in the reopened period; the drafting of deposition notices for the witnesses to be deposed during that period, and responding to Defendant's communications regarding the same; responding to Defendant's motion for protective order sought to prevent the Court-ordered discovery from occurring; preparation for the depositions to be taken in the reopened period; the taking of eight (8) depositions; efforts to confer with Defendant's counsel regarding costs incurred in the reopened discovery period; and drafting of the instant motion for costs.   (Id.)   Having carefully reviewed the time entries,[6] and noting the extensive nature of the belatedly-disclosed Facility Security Plan and the additional discovery necessitated by it, and further noting that Defendant offers no specific objections to any time entry, the Court finds that Plaintiff's request to be reimbursed for 160.2 hours of attorney time in connection with the belatedly-disclosed Facility Security Plan is reasonable.

The Court next addresses the billing rate claimed by Plaintiff.   As noted above, "a reasonable hourly rate is calculated according to the prevailing market rates in the relevant community."   See Maldonado, 256 F.3d at 184.   The Court determines the "prevailing market rates in the relevant community" based on an "assess[ment of] the experience and skill of the prevailing party's attorneys and compar[ison of] their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."   See Interfaith Cmty.Org., 426 F3d. at 708 (internal quotation omitted).   Despite

---

[6] The Court notes that none of the time entries appear to be unnecessary or duplicative.

the fact that some of the time was spent by Attorney Roni Schiffman, an attorney with forty (40) years' experience, Plaintiff seeks reimbursement of time at the rate of Attorney Jason Schiffman, which, as noted above, he represents is $275.00 per hour for time spent outside of deposition and court appearances, and $305.00 per hour for time spent in deposition and court appearance. (Doc. No. 116 ¶¶ 192-97.)   The Court notes that Attorney Schiffman represents that he has been engaged in the practice of law for 13 years and has litigated over 300 cases as lead counsel.   (Id. ¶ 203.)

Upon review of cases awarding fees to attorneys practicing in the Middle and Western Districts of Pennsylvania referenced by Plaintiff, and in the absence of any specific objection from Defendant beyond a statement that "the manner in which [Plaintiff's] fees are calculated" is unreasonable, the Court finds that the rates billed by Plaintiff's counsel in connection with this matter are in accord with the prevailing market rate charged by an attorney with Attorney Schiffman's skill and experience.   See Onion Drilling Co., LLC v. EQT Prod. Co., No. 16-1516, 2019 WL 4267386, at *2-5 (W.D. Pa. Sept. 10, 2019) (finding discounted rates of $403.75 per hour for a twenty (20) year practitioner, $289.00 per hour for a nine (9) year practitioner, $289.00 per hour for a seven (7) year practitioner, and $295 per hour for a four (4) year practitioner were all appropriate rates for purposes of a lodestar calculation); Gillespie v. Dring, No. 3:15-cv-00950, 2019 WL 5260318, at *6-9 (M.D. Pa. Oct. 17, 2019) (discussing rate request of $425.00 and $375.00 per hour but finding $285.00 per hour to be a reasonable fee for the Middle District of Pennsylvania); Berkoben v. Aetna Life Ins. Co., No. 2:12-cv-1677, 2014 WL 3565959, at *18-21 (W.D. Pa. July 18, 2014) (finding $400.00 per hour fee to be reasonable in Pittsburgh).   Accordingly, upon consideration of the above, the Court finds that the billing rates at which Plaintiff seeks reimbursement are reasonable, and therefore, finds the total amount of

attorneys' fees sought by way of this motion -- $38,944.50 -- to be reasonable.

With regard to Plaintiff's request for costs, the Court is unpersuaded by Defendant's argument that Plaintiff's identified costs are not "reasonably specific."   As Plaintiff notes, every bill for these costs was submitted in connection with Plaintiff's motion as Exhibits 12 and 13. (Doc. Nos. 116-14 and 116-15.)   The Court's review of these Exhibits reveals that they meet any standard for reasonable specificity.

Further, as discussed <u>supra</u> at note 4, the Court is similarly unpersuaded by Defendant's effort to demonstrate the Plaintiff unnecessarily increased his expert report costs as to Captain DiNapoli by failing to forward relevant information to him such that Captain DiNapoli could have incorporated that information into his initial expert report, or else delayed the drafting and filing of his expert report so as to prevent the need to file such a supplemental expert report and incur the costs associated with a supplemental report.   Captain DiNapoli's Declaration, submitted in connection with Plaintiff's reply brief, supports Plaintiff's position that he communicated all statements/positions of Defendant with regard to safety and access control policies in a timely manner. (Doc. No. 132.)

Finally, the Court is not persuaded by Defendant's argument that Plaintiff is not entitled to costs (or fees) attendant to deposing four (4) newly-identified witnesses in the reopened discovery period.   Defendant argues that if it "had produced its ASPs on 'Day 1' of this litigation, [Plaintiff] would have borne the costs to depose Mr. Lacek, Mr. Krug, Mr. Jones, and Mr. McDevitt."   (Doc. No. 120 at 28.)   As an initial matter, the Court notes that Defendant's speculation about who Plaintiff would have chosen to depose in the initial discovery period if Defendant had disclosed the clearly relevant Facility Security Plan and ASPs in a timely manner is not a sufficient basis for the Court to deny recovery of reasonable costs and fees related to

witnesses whose depositions were newly taken in the reopened discovery period.   While it is possible that Plaintiff would have deposed these individuals in the initial discovery period and so would have borne the costs of those depositions had Defendant met its discovery obligations, Defendant's argument, as Plaintiff notes, "misses the mark."   (Doc. No. 129 at 14.)   The point of Plaintiff's motion is that Defendant did <u>not</u> produce its ASPs on "Day 1," or in fact at any time during the initial period of fact discovery in this matter, as the Court has found that it should have.   As noted by Plaintiff, "[s]ince Defendant had failed to identify or produce the disputed documents in accord with its discovery obligations, Plaintiff had no reason to know that these individuals were in possession of relevant information" until <u>after</u> Defendant produced its Facility Security Plan and ASPs.   (<u>Id.</u>)   Accordingly, whatever cost burden may have been appropriate in the event Defendant had properly discharged its discovery obligations is not relevant to the situation at hand, where the Court has determined that Defendant failed to disclose its Facility Security Plan and ASPs in a timely manner.

   Where, as here, it is clear that Defendant's purposeful failure to disclose highly relevant information has unnecessarily complicated this litigation, causing unneeded delay and additional Court intervention,[7] and necessitating the reopening of discovery in this matter, Plaintiff is

---

[7] As discussed <u>supra</u> at pages 4-5, upon the Court's finding that the belatedly-disclosed Facility Security Plan was relevant information and necessitated the reopening of discovery in this matter, the Court issued an Order dated April 17, 2019 stating that "during [this] time the parties may obtain discovery from any witness, whether or not previously deposed, who may be in possession of information related to the Facility Security Plan."   (Doc. No. 83 at 2.) Defendant's refusal to comply with this Order necessitated additional Court involvement when, over two months later, and shortly before the reopened discovery period was scheduled to close, Defendant, incredibly, filed a motion for protective order (Doc. No. 87) seeking to avoid disclosure to Plaintiff of the <u>very information the Court ordered it to disclose in its April 17, 2019 Order</u>.   Defendant's filing resulted in the Court's ultimate issuance of an Order which reiterated that, when it issued its previous Order, "it was apparent to the Court that Defendant had withheld the Facility Security Plan from Plaintiff despite its clear relevance to Plaintiff's

entitled to full compensation for all reasonable expenses incurred in connection with the

reopened discovery period.   The Court finds that the costs (and fees) sought to be recovered by

Plaintiff were "caused by [Defendant's] failure," <u>see</u> Fed. R. Civ. P. 37(c)(1)(A), and are

"directly attributable to the conduct that is the subject of the sanctions [o]rder."   <u>See</u> <u>Kaisha</u>,

2019 WL 5079571, at *4.   Accordingly, the Court will direct the payment of costs in the amount

of $28,670.23, in addition to the reasonable attorney's fees discussed <u>supra</u>.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court will grant Plaintiff's Motion for Costs in its

entirety.   An appropriate Order follows.

---

previous discovery requests," and further stated that "[a]s previously determined by the Court in
its April 17, 2019 Order, Plaintiff is entitled to depose or inquire of any witness, whether or not
previously deposed or examined, on any matter that relates, directly or indirectly, to the Facility
Security Plan."   (Doc. No. 89.)   The Court's Order appropriately denied Defendant's motion
and directed Defendant "to comply with the Court's April 17, 2019 Order forthwith."   (Doc. No.
89.)